IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| | ) | |
| | ) | |
| TIMOTHY D. PETTY, | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | 07 C 7013 |
| | ) | |
| CITY OF CHICAGO, et al., | ) | Judge Virginia M. Kendall |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Timothy Petty ("Petty") filed suit against the City of Chicago and individual police officers (collectively, "Defendants") alleging they violated his constitutional rights by charging, arresting, incarcerating and prosecuting him for murder based on witness identifications that he claims were coerced.  Petty alleges that Defendants concealed evidence and failed to disclose their misconduct in violation of the Due Process Clause under the Fifth and Fourteenth Amendments of the Constitution and *Brady v. Maryland*, 373 U.S. 83, 87 (1963).  In addition, Petty asserts state law claims against Defendants for false imprisonment, malicious prosecution, intentional infliction of emotional distress, and conspiracy.

Defendants move for summary judgment, contending that Petty's acquittal at his criminal trial extinguishes his *Brady* claim and establishes probable cause to eliminate his state law claims. For the reasons stated in this opinion, Defendants' motion for summary judgment is denied in part and granted in part.

## I.    Undisputed Facts

The district court may require strict compliance with Local Rule 56.1. *See Ammons v. Aramark Uniform Servs., Inc.*, 368 F.3d 809, 817 (7th Cir. 2004); *Bordelon v. Chicago School Reform Board of Trustees*, 233 F.3d 524, 527 (7th Cir 2000) (strict compliance with the local rules governing summary judgment is upheld given the importance of local rules that structure the summary judgment process); *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs"). The court may disregard statements and responses that do not comply with Local Rule 56.1. *See Cichon v. Exelon Generation Co.*, 401 F.3d 803, 809-10 (7th Cir. 2005).

In response to Defendants' motion, Petty admitted that all of the facts identified by Defendants are true; all 72 are deemed admitted. *See Chelios v. Heavener*, 520 F.3d 678, 687 (7th Cir. 2008); L.R. 56.1(b)(3)(B).  Petty filed 169 additional facts in opposition without having received leave from this Court, thereby prompting Defendants to file a motion to strike all facts in excess of the 40 allowed by Local Rule 56.1 and without waiving their objection, answered the statements in the spirit of caution and efficiency.  (Docs. 132, 135).  The Court strikes Petty's additional facts in opposition in excess of the 40, additionally noting that most were unacceptably argumentative or failed to cite to specific support in the record.  *See Drake v. Minn. Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998) ("'Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter[;] rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted.'").

### A. The Shooting and the Identifications

In the middle of the night of October 18, 2003, a group of men sat smoking marijuana on a porch on the north side of Chicago. (Doc. 120, Def's SOF § 4, 7, 30). Two shooters walked up with handguns and opened fire; as a result, one man died and two were wounded, including Sebastian Moore ("Moore"). (Def's SOF § 4, 7). Just minutes after the shooting, officers arrived at the chaotic scene and were advised by some of the men (in dispute is which individuals provided the description) that the shooters were black, 16 to 18 years old and 5'0" to 5'5" inches tall who were wearing dark clothing, masks and skull caps. (Def's SOF § 25; Doc. 135, Def's Resp. to Pltf's SOF § 34-37). Petty asserts that he was 22 years old and 5'11" at the time of the shooting; though he does not provide a reference to properly support this assertion, a police officer who was present at the scene later testified at his deposition that if Petty was in fact 5'11" and 190 pounds, then Petty would not fit the description that the witnesses gave to him and his fellow officers. (Def's Resp. to Pltf's SOF § 39). Defendants were told that the men on the porch had been drinking cognac and "smoking weed." (Def's Resp. to Pltf's SOF § 22). Officers brought Frederick Tarver ("Tarver") and Mario Parker ("Parker") to Area 3 for further questioning, and Tarver testified at his deposition for this case that Parker was the one who said the shooter looked like "Spank." (Doc. 130-8, Pltf's SOF Ex. K, p.55). Tarver also said that he remained at Area 3 for questioning for approximately 12 hours. (Def's SOF § 46). Defendant Detective Harry Fenner ("Fenner") testified that he showed Tarver a photo array of six individuals, later during the 15-16 hour confinement, from which Tarver selected the photo of Petty and signed the array. (Def's SOF § 28).

On November 29, 2003, Petty was arrested pursuant to an outstanding warrant for drinking in a public way. (Def's SOF § 5). On November 30, 2003, Moore was interviewed by officers and described the two shooters as being: a black male wearing a black doo-rag with braids hanging out, with a black sweatband over it, black jacket, with very light eyes; and a black male wearing a black pullover hoody. (Def's SOF § 6). That day, officers conducted a line-up with Petty, and Fenner testified that Tarver identified Petty as a shooter, and that Moore also identified him as a shooter but that Petty had changed his hairstyle. (Def's SOF § 29, 8). A Defendant officer testified at his deposition that Moore left the police station and returned on December 1, 2003. (Def's SOF § 9). However, in contrast with the officer's account, Tarver later testified that he and Moore returned to the police station because officers kicked in the door to Tarver's home, handcuffed both Tarver and Moore, and took them to the police station, after repeated calls threatening him that he had to identify and testify against Petty even though Tarver did not know for sure whether Petty was the shooter. (Def's SOF § 39, 43).

On December 1, 2003, Assistant State's Attorney Marcelle LeCompte (the "ASA") became involved in this criminal matter when she made the decision, in consultation with her supervisor, to charge Petty with murder and aggravated battery with a firearm. (Def's SOF § 10). The ASA stated at her deposition that she could not recall whether she ever interviewed Tarver or Moore before charging Petty, nor can she tell from her file whether she met with Tarver or Moore, but stated that "I am an extremely diligent attorney, and if witnesses were there to be spoken with, I would have spoken with them." (Def's SOF § 11).

The grand jury heard testimony from six people on December 9, 2003, including Tarver,

4

and Moore who testified that the person he saw shoot him was the person he identified in the line-up, but that he did not know him.  (Def's SOF § 15).  Petty's girlfriend Saidah Holloway ("Petty's girlfriend") also testified that the photo of the person in the line-up was "Spanky" whose real name is Petty.  (Def's SOF § 17).  The grand jury indicted Petty for murder and aggravated battery with a firearm on December 19, 2003.  (Def's SOF § 18).

B.  **Petty's Motions Before Trial and Bench Trial**

On February 25, 2005, Petty filed a motion to quash his arrest and suppress the line-up identifications in his criminal matter.  (Def's SOF § 19, 20).  The state court judge heard arguments from Petty's counsel and testimony from Defendant police officers, including Fenner who testified that on the night of the shooting, Tarver said that one of the people shooting was someone he knew by the name of "Spank" who was a member of the Gangster Disciple gang from the Thorndale area.  (Def's SOF § 26).  Fenner also testified that Petty had told him that on the night of the shooting, he had been at a dance club with his girlfriend; when Fenner interviewed Petty's girlfriend, she said that at whatever day and time that Petty said they were together at the dance club is when they were there.  (Def's SOF § 31-32).  The state court judge denied Petty's motion on June 23, 2005, stating: "I find that the police investigation showed that there was, indeed, probable cause to arrest Mr. Petty, he had been identified as the shooter by a witness by way of a photo array…. I find the police were not responsible for misconduct during the matters brought forward in this motion. Motion denied."  (Def's SOF § 33).

Petty filed a second motion to suppress the identification testimony on November 15, 2005.

(Def's SOF § 35). The state court judge again heard arguments from Petty's counsel and testimony from Tarver that the police were trying to make him point out Petty as the shooter at the line-up, that the police threatened to report his parole violation unless he cooperated and tried to convict Petty, and that he was kept in a locked interview room overnight. (Def's SOF § 40-42). Tarver testified that on the night of the shooting, he could not recall seeing a photo of Petty or signing it at the precinct, and that his memory of that night was poor because he had been held for 12 hours, was tired and his mind was probably "not working right." (Def's SOF § 46). Tarver also testified that Parker repeatedly stated that "Spanky did it" when the police arrived at the scene of the shooting and that Tarver told the police what Parker had said. (Def's SOF § 44). Finally, Tarver testified that he had filed a civil lawsuit against the police for their treatment of him and that the suit was pending. (Def's SOF § 47). At the hearing, the state court judge heard testimony from officers at the scene of the shooting, who testified that Tarver said that the shooter was someone he knew as "Spanky" from Thorndale, and that at the line-up, Tarver identified Petty. (Def's SOF § 48-49). The state court judge denied Petty's motion on January 12, 2006, stating:

> The fact of the matter is that in this case I find that the police got the name Spank from Mr. Tarver. It didn't come out of a vacuum. They didn't pull it out of a hat. It wasn't part of a conspiracy to somehow elaborately frame somebody named Spank…. But I find here that the police investigator done this case in good faith, Mr. Tarver didn't want to help him cooperate but that doesn't mean that they suggest[ed] who he ought to pick out, that they were persistent in interrogating him and in seeking information that only he could have had because he was one of the people that was shot…. I don't find police misconduct here as to the point that they were suggesting who he ought to pick out….
>
> Def's SOF § 51.

6

At Petty's bench trial for murder and aggravated battery with a firearm, Moore did not testify nor was evidence introduced about any identification made by him. (Def's SOF § 53). At the conclusion of Petty's bench trial on August 23, 2006, the state court judge found him not guilty of murder. (Def's SOF § 52).

### III.     Legal Standard

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). All of the evidence and the reasonable inferences that may be drawn from the evidence are viewed in the light most favorable to the non-movant. *Miller v. American Family Mutual Ins.*, 203 F.3d 997, 1003 (7th Cir. 2000). Summary judgment may be granted when no "reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). However, a party cannot defeat summary judgment by relying on unsubstantiated facts or by merely resting on its pleadings. *See Hemsworth, II v. Quotesmith.com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007); *Greer v. Board of Educ. of the City of Chicago*, 267 F.3d 723, 729 (7th Cir. 2001). Instead, the party that bears the burden of proof on an issue must affirmatively demonstrate—with admissible evidence—that a genuine issue of material fact exists that requires a trial. *See Hemsworth*, 476 F.3d at 490. At summary judgment, the "court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or

to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact." *National Athletic Sportswear, Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir. 2008).

IV. **Discussion of *Brady* Claim**

A. **Petty's *Brady* Claim Is Not Extinguished by His Acquittal**

Petty claims that the officers denied him due process and his right to a fair trial under the Fifth and Fourteenth Amendments, and claims that Defendants conspired to violate his rights by withholding exculpatory information. In the Seventh Circuit, a plaintiff who is wrongfully convicted of murder and later pardoned can bring a Section 1983 suit against the officers who coached the witnesses to select him from a line-up. *Newsome v. McCabe ("McCabe I")*, 256 F.3d 747, 749 (7th Cir. Ill. 2001) (affirming district court's denial of defendants' summary judgment because "a jury could find that [the officers] encouraged two witnesses to select [plaintiff] from a line-up-- which the witnesses did, forming a vital link in the process that led to [plaintiff]'s conviction as [a] killer--yet withheld from the prosecutors information about their coaching of the witnesses and the fact that these witnesses earlier selected pictures from a book of mug shots that did not contain [plaintiff]'s photo.") The officers' liability fell within the due process clause because they "concealed exculpatory evidence -- the details of how they induced the witnesses to finger [the plaintiff]." *Newsome v. McCabe ("McCabe II")*, 319 F.3d 301, 304 (7th Cir. Ill. 2003). This characterization—that the officers' methods of inducing witnesses to make identifications is exculpatory evidence—is important because it allows the wrongfully-accused to file his

constitutional claim within the federal court under *Brady v. Maryland*, 373 U.S. 83, 87 (1963), though the *Brady* framework may appear ill-fitting for such a claim, as further explained below.

A *Brady* violation can be broken down into three basic elements that a plaintiff must prove: (1) the evidence at issue is favorable to the accused, as either exculpatory or impeaching; (2) the evidence must have been suppressed by the government, either willfully or inadvertently; and (3) there is a reasonable probability that prejudice ensued—in other words, "materiality." *See Youngblood*, 547 U.S. at 869-70; *United States v. Bland*, 517 F.3d 930, 934 (7th Cir. 2008); *Ienco v. Angarone*, 429 F.3d 680, 683 (7th Cir. 2005). Evidence is "suppressed" when (1) the prosecution failed to disclose the evidence in time for the defendant to make use of it, and (2) the evidence was not otherwise available to the defendant through the exercise of reasonable diligence. *Id. a*t 683. Petty challenges the circumstances under which Tarver and Moore named him as the shooter and the methods used by the officers during their line-up identifications. Petty argues that if the ASA had known the evidence—the allegedly coercive circumstances and methods—then she would not have proceeded to charge, indict and prosecute Petty and he would not have been detained for two years awaiting trial.

If the officers used coercive techniques in creating the line-ups, for example, by using sleep-deprived and drug- or alcohol-affected witnesses to do their bidding, then the identifications upon which the ASA relied could be challenged. In addition, if the evidence supports that it was known that the officers had done so intentionally in order to charge the defendant, they could be impeached. Recently, the Supreme Court reiterated that a *Brady claim* exists when a defendant was

convicted of first-degree murder on the testimony of a single eyewitness, because the officers failed to disclose statements by the eyewitness contradicting his testimony and undermining the credibility of his identification on the night of the shooting. *Smith v. Cain*, 565 U.S. ____, 3, 2012 WL 43512 (Jan. 10, 2012) (officer's notes that eyewitness said on the night of the shooting that he "could not ID anyone because [he] couldn't see faces" and "would not know them if [he] saw them" were plainly material and required remand).

Defendants argue that Petty's acquittal extinguishes his due process claim, because he would not be able to show that any withheld evidence was material to the outcome of the trial since the outcome was in his favor. Yet, Petty's claim is not merely that the outcome of the trial was predicated upon the withheld evidence, but also that the State's Attorney's Office's decision to press charges was based on the questionable and allegedly coerced identifications. This is precisely why a plaintiff may still have a *Brady* claim even if he is acquitted, if prompt disclosure of the suppressed evidence "would have altered the prosecution's decision to proceed to trial." *Parish v. City of Chicago*, 594 F.3d 551, 554 (7th Cir. Ill. 2009) ("Although we have expressed doubts about whether a defendant who has been acquitted can establish prejudice, in previous cases, we have analyzed potential claims in order to determine if the decision to go to trial would have been altered by the suppressed evidence. "); *cf. McCabe I* at 752 ("*Brady* identifies a trial right."). A reasonable jury could decide that the prejudice ensued as soon as Petty was charged with murder by the ASA based on the questionable identifications and persisted as the officers allegedly failed

10

to disclose to her the methods by which they had obtained those identifications.   Consequently,

Petty's *Brady* claim is not extinguished by his acquittal.

Whether the evidence was suppressed by the government either willfully or inadvertently

remains a question of fact that cannot be resolved at this stage without a jury.

Cases analyzing false confessions are not helpful in determining whether Petty has a valid

constitutional claim.   It is true that a plaintiff has no *Brady* claim when he was present and aware

of his false confession and the allegedly coercive conditions under which he made it.  *Gauger v.*

*Hendle*, 349 F.3d 354, 360 (7th Cir. 2003); *see Sornberger v. City of Knoxville*, 434 F.3d 1006, 1029 (7th

Cir. Ill. 2006) ("[plaintiff] knew herself what occurred during the interrogation, and the police were

under no *Brady* obligation to tell her again that they coerced her into confessing.").   Cases

analyzing false c*onfessions* are fundamentally different from cases examining the consequences of

false *identifications*, which is the present case.[1]  Instead, *Jones v. City of Chicago* offers a proper

framework for analysis, in which police officers engaged in "frightening abuses of power" by

conducting improper witness identification and withholding exculpatory "street files" in order to

have a defendant charged with murder.   856 F.2d 985, 988 (7th Cir. 1988).  It was not until trial

---

[1]The Court granted Defendants' motion to supplement their motion for summary judgment with additional case law. (Doc. 147).  Defendants present *Holland v. City of Chicago*, 433 F.3d 248 (th Cir. 2011), as being directly on point. In *Holland*, a plaintiff brought a *Brady* claim and malicious prosecution due to the police officers' improper "show-up" in which the victim identified the plaintiff, although she had previously stated thrice that he was not her assailant.  *Id.* at 256.  The Seventh Circuit affirmed the district court's grant of summary judgment for the officers, because there was no evidence that the officers coerced the victim into lying; instead, the victim testified that she initially hesitated to make an identification because she was "afraid" of her assailant.  *Id.*  "[T]hat explanation, coupled with some fairly strong physical evidence–particularly [distinctive clothing]–would have resolved any doubt about [plaintiff's] guilt in the state's favor."  *Id.*  In this case, Defendants lacked any physical evidence tying Petty to the scene of the crime, and Petty has presented evidence from his eyewitnesses testifying that they were in fact coerced.  Probable cause rested solely on the eyewitness identifications.  Therefore, the caselaw is relevant but sufficiently distinguishable so that it is not dispositive to Petty's claims.

began that a whistleblower alerted defendant's counsel and the judge declared a mistrial. *Id.* at 991. The Seventh Circuit affirmed the district court's jury trial's finding that the officers engaged in a conspiracy to commit a Section 1983 due process violation. *Id.* at 992. Here, Petty explains that he had no personal or direct knowledge of the circumstances under which Tarver and Moore identified him. Defendants argue that because Petty knew of the evidence that would have entitled him to a "fairer trial" prior to commencement of the trial, the evidence cannot be deemed suppressed by the government; they point to Petty's two motions and hearings before the state court judge as indicating both his knowledge of the evidence and his opportunities to raise it to the court's attention and fully argue his position. Yet, the inquiry is not tied to the time of trial, but rather to the time at which the prosecution made its decision to proceed to trial. *Parish*, 594 F.3d at 554 ("Although we have expressed doubts about whether a defendant who has been acquitted can establish prejudice, in previous cases, we have analyzed potential claims in order to determine if the decision to go to trial would have been altered by the suppressed evidence."); *see also Williams v. Carroll*, 2009 U.S. Dist. LEXIS 11534 (N.D. Ill. Feb. 17, 2009*)* ("It may be possible to make a successful *Brady* claim even where the defendant was acquitted if the allegedly withheld evidence is materially favorable to the accused, and if its disclosure would have resulted in the dismissal of the charges before trial.").

Tarver did not file his lawsuit against the officers alleging coercion until November 24th, 2004, by which time Petty had already been in custody for almost one year. Petty has raised a genuine issue of fact as to whether Tarver's lawsuit was the first time he learned of their

complaints of coercion leading them to identify him, and when he was made aware of Tarver and Moore's inconsistent statements at the time of their eyewitness identifications. In addition, the Court finds that genuine issues of material facts remain surrounding the circumstances of the officers' detainment of Tarver and Moore for 16 hours on the night of the shooting, the officers' communications with the ASA, and the line-up process. The ASA testified at her deposition that she cannot recall whether she ever interviewed Tarver or Moore, and her notes in her file do not indicate either way, before she charged Petty with murder and aggravated battery with a firearm. When viewing the evidence in the light most favorable to Petty, as required when Defendants have moved for summary judgment, the circumstances appear coercive. Further, the Defendants do not clearly establish in their record that the circumstances of the eyewitness identifications were evident to the ASA or to Petty, or otherwise available to Petty through the exercise of reasonable diligence, which is the crux of his *Brady* claim. According to Petty, Moore fled the state after testifying before the grand jury and eluded deposition subpoenas that were attempted by both parties to this litigation. Petty's counsel, however, was able to meet with him and corroborate Tarver's description of the coercion.[2] By the time of trial, the ASA knew Tarver was describing his identification as coerced, but the record does not indicate whether Moore was still in-state and available or had already left the state. After reviewing the Rule 56 statements, material factual questions exist as to whether the ASA knew or could have known the methods used by

---

[2] However, Moore's affidavit proposed by Petty remains unsigned and unsworn by Moore, which fails to comply with Federal Rule of Civil Procedure 56(e) and this Court rejects it. *Friedel v. City of Madison*, 832 F.2d 965, 970 (7th Cir. 1987); see also *Weiss v. Cooley*, 230 F.3d 1027, 1034 (7th Cir. 2000) (noting that an affidavit that stated various facts "on information and belief" was "not enough to satisfy the personal knowledge requirement for affidavits").

Defendants during the line-up and whether an incarcerated accused and his public defender could have interviewed the witnesses to ascertain the circumstances surrounding their identifications. The ASA testified at her deposition for this case that hypothetically, if she had reviewed a case with only two witnesses and the officers told her they coerced the witnesses, then she would not have approved charges. Doc. 130-17, p. 121-123. Because the facts presented are disputed as to whether Tarver and Moore were in fact coerced into identifying him, and no other physical evidence was presented at trial to inculpate him, a reasonable jury could return a verdict in Petty's favor.

### B. Defendants Are Not Entitled to Qualified Immunity

For Defendants to invoke qualified immunity and avoid monetary liability, the inquiry before the Court is whether it was clearly established at the time that Petty was charged that police could not withhold from the ASA any exculpatory information about the circumstances of the witnesses' identification and the methods used at the line-up. *See Saucier v. Katz*, 532 U.S. 757 (U.S. 2001); *McCabe I* at 752-753. The *Brady* principle was announced in 1963 and applied by the Supreme Court in *Jones v. City of Chicago, supra*. Therefore, it is clearly established law that a defendant has a constitutional right to witness identifications that are free from coercion, and to a fair trial free from false evidence. Therefore, Petty may proceed to attempt to establish that a constitutional violation occurred and that Defendants conspired to do so. Defendants' motions for summary judgment on Counts I and II are denied.

### V. Discussion of Petty's State Law Claims

14

This Court retains supplemental jurisdiction over Petty's state law claims since his Section 1983 claim will be going to trial. 28 U.S.C. §§ 1331, 1343. Petty was imprisoned on November 29, 2003, was acquitted on August 23, 2006, and filed his initial complaint in state court on November 30, 2006, alleging false arrest, false imprisonment and malicious prosecution. Doc. 120 Ex. S, no. 06 L 12512. Petty's Third Amended Complaint alleges false imprisonment (Count IV), malicious prosecution (Count V), intentional infliction of emotional distress (Count VI), civil conspiracy to imprison and maliciously prosecute him (Count VII), as well as derivative claims against the City of Chicago under the doctrine of *respondeat superior* (Count VIII) and for indemnification (Count IX). This Court dismissed the *Monell* claim (Count III) of the Third Amended Complaint and denied Petty's motion to file a Fourth Amended Complaint. Docs. 49, 124.

A. **Petty's Claim of False Imprisonment**

A claim of false imprisonment that is not brought within one year of the injury is barred by Illinois tort law, 745 ILCS § 10/8-101, unless the "doctrine of continuing violation" applies. *Evans v. City of Chicago*, 434 F.3d 916, 934 (7th Cir. Ill. 2006); *see Feltmeier v. Feltmeier*, 207 Ill. 2d 263, 798 N.E.2d 75, 85, 278 Ill. Dec. 228 (Ill. 2003) (the limitations period does not begin to run until the date of the last injury or the date the tortuous acts cease). District courts have found that false imprisonment claims under Illinois law accrue at the time of the arrest, as a single overt act, and not at the time of acquittal. *See, e.g., Pierce v. Pawelski*, 2000 U.S. Dist. LEXIS 18229, 2000 WL 1847778, at *2 (N.D. Ill. Dec. 14, 2000); *Kitchen v. Burge*, 2011 U.S. Dist. LEXIS 42021, 2011 WL

1485301, at *14 (N.D. Ill. Apr. 19, 2011); *Jones v. Navia*, 2010 U.S. Dist. LEXIS 124126, 2010 WL

4878869, at *4 (N.D. Ill. Nov. 23, 2011); *Thompson v. City of Chicago*, 2009 U.S. Dist. LEXIS 20348,

2009 WL 674353, at *5 (N.D. Ill. Mar. 12, 2009) (noting that the majority view of the district courts

"reflect[s] the general principles of tort claim accrual set forth by the Illinois Supreme Court.").

In this case, Petty's claim is based on Defendants' alleged coercion at the time of identifications in

2003, which is a single overt act that caused his injury, and their failure to disclose the details,

which continued from that injury. *See Feltmeier*, 207 Ill. 2d at 279 ("A continuing violation or tort

is occasioned by continuing unlawful acts and conduct, not by continual ill effects from an initial

violation."). Petty may still claim that until Tarver filed his own civil complaint alleging coercion,

Petty was unaware of the exculpatory evidence—which remains the factual crux of this case and

to be proved at trial—but he cannot dispute that he believed himself to be falsely imprisoned at

the time of his own imprisonment, and at the latest at the time of the grand jury indictment.

Consequently, his claim of false imprisonment accrued in 2003 and is time-barred.

**B. Petty's Claim of Malicious Prosecution**

To prevail on his claim of malicious prosecution, Petty must show: (1) commencement or

continuance of an original criminal or judicial proceeding by Defendants; (2) termination of the

proceeding in his favor in a manner indicative of his innocence; (3) absence of probable cause for

such proceeding; (4) presence of malice; and (5) damages resulting to the plaintiff. *Swick v.

Liautaud*, 169 Ill. 2d 504, 512, 662 N.E.2d 1238 (Ill. Sup. 1996). Defendants challenge Petty's ability

to prove (1), (2) and (3) and consequently waive their defense to (4) and (5). The first two

16

elemenets can be addressed succinctly. First, officers who coerce witness identification that serve as the foundation for an ASA's review and decision to charge are instrumental in the commencement of the criminal proceeding. *See McCabe I* at 752 ("If officers are not candid with prosecutors, then the prosecutors' decisions--although vital to the causal chain in a but-for sense--are not the important locus of action."). Second, Petty was acquitted and so the termination of his case was favorable to him. *Logan v. Caterpillar, Inc.*, 246 F.3d 912, 926 (7th Cir. 2001) ("an acquittal is clearly sufficient to show a favorable termination.").

Regarding the third element, Petty's ability to prove the absence of probable cause, is intrinsically tied to the facts that guide the inquiry above regarding Petty's Section 1983 claim. At this stage, a reasonable jury could view Tarver's testimony about his allegedly coerced identification as a basis for ruling in Petty's favor and decide that Moore's absence from trial proceedings raises material questions as to whether Moore's testimony was obtained in the same manner as Tarver's identification. The ASA testified that she used her judgment in addition to the identifications to charge Petty, but the record fails to present other physical evidence implicating Petty in the shooting. This could lead a reasonable jury to determine that without those identifications, the record lacks sufficient and reliable evidence of Petty's culpability to constitute probable cause with which the officers and the ASA could charge and commence criminal proceedings.

Defendants argue that revisiting and re-litigating this issue is barred by the doctrine of collateral estoppel because the state court judge found probable cause to proceed to trial. In Illinois, courts do not give preclusive effect to an issue unless there has been a final judgment on

17

the merits, meaning that the potential for appellate review has been exhausted. *Ballweg v. City of Springfield*, 114 Ill. 2d 107, 113, 499 N.E.2d 1373, 102 Ill. Dec. 360 (1986). Petty had no reason to appeal the state court's bench trial decision because he was acquitted. Therefore, the judgment of the state court never became final. *People v. Mordican*, 64 Ill. 2d 257, 261, 356 N.E.2d 71, 1 Ill. Dec. 71 (1976); *see also Sornberger*, 434 F.3d at 1021 (citing *Mordican* and overturning district court's use of collateral estoppel to precluding revisiting an Illinois court's credibility determination at a probable cause hearing). This Court's analysis in *Lyttle v. Killackey* supports the barring of collateral estoppel in this case, because what remains in question are not just the determination of credibility that took place at the state court hearing with Tarver's testimony, but also whether communications between police officers, the ASA, Moore and Tarver took place. 546 F. Supp. 2d 583, 589 (N.D. Ill. 2008). Consequently, Defendants' motion for summary judgment on Petty's claim for malicious prosecution is denied.

### C. Petty's Claim of Intentional Infliction of Emotional Distress

In Illinois, a claim of intentional infliction of emotional distress must be proved with evidence that: (1) the defendant's conduct was extreme and outrageous; (2) the defendant either intended that his conduct should inflict severe emotional distress, or knew that there was a high probability that his conduct would cause severe emotional distress, (3) the defendant's conduct in fact caused severe emotional distress. *Dunn v. City of Elgin,* 347 F.3d 641, 651 (7th Cir. 2003), *citing Doe v. Calumet City*, 161 Ill. 2d 374, 641 N.E.2d 498 (Ill. Sup. 1994). Defendants challenge whether the nature of their conduct would be "regarded as intolerable in a civilized society" but

18

a reasonable jury could find that detaining witnesses for 16 hours, coercing them into identifying an accused and using unduly suggestive line-up procedures resulting in a two-year period of pre-trial detention are intolerable in a civilized society. *See Id.* Defendants cannot pass the blame to the ASA by citing to Illinois law that it is the duty to prosecute criminal proceedings; their conduct would remain a cause of the emotional distress that Petty would have suffered while awaiting trial. *See McCabe I* at 752 ("Prosecutors kept in the dark by the police (and not negligent in failing to hire other persons to investigate the police) won't improve their performance with or without legal liability for their conduct. Requiring culpable officers to pay damages to the victims of their actions, however, holds out promise of both deterring and remediating violations of the Constitution.*"*). Furthermore, Illinois tort law does not grant immunity to the officers (or the City, by extension) because a reasonable jury could find that their conduct was "willful and wanton" as being in "utter indifference to" Petty's safety and liberty when they were coercive in interviewing Tarver, and possibly Moore, as well as in crafting the allegedly false line-ups. Illinois Tort Immunity Act, 745 ILCS §§ 10/1-210, 10/2-202. Consequently, Defendants' motion for summary judgment on Petty's claim of intentional infliction of emotional distress is denied.

### D. Petty's Derivative Claims against the City of Chicago

Petty's derivative claims against the City of Chicago under the doctrine of *respondeat superior* and for indemnification are subject to Illinois tort law that provides immunity to the public entity when the employee is not liable. 745 ILCS § 10/2-109. Because Petty's claims of malicious

prosecution and intentional infliction of emotional distress survive Defendants' motion for summary judgment, the derivative claims survive as well.

### VI.    Conclusion

For the reasons stated, this Court denies Defendants' motion for summary judgment with regard to due process violation (Count I), conspiracy to commit due process violation (Count II), malicious prosecution (Count V), intentional infliction of emotional distress (Count VI), civil conspiracy to imprison and maliciously prosecute him (Count VII), as well as derivative claims against the City of Chicago under the doctrine of *respondeat superior* (Count VIII) and for indemnification (Count IX).  This Court grants Defendants' motion for summary judgment with regard to false imprisonment (Count IV).

_____
Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date: January 12, 2012